## IN THE COURT OF APPEALS OF IOWA

No. 16-1644
Filed October 11, 2017

IN RE THE MARRIAGE OF CYNTHIA LYNN ALBERTSEN
AND MARK DUANE ALBERTSEN

Upon the Petition of
**CYNTHIA LYNN ALBERTSEN,**
        Petitioner-Appellant,

**And Concerning**
**MARK DUANE ALBERTSEN,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Tama County, Christopher L.

Bruns, Judge.

        Cynthia Albertsen appeals from the decree dissolving her marriage to

Mark Albertsen.  **AFFIRMED.**

        Barry S. Kaplan and C. Aron Vaughn of Kaplan & Frese, L.L.P.,

Marshalltown, for appellant.

        Cheryl L. Weber and Erich D. Priebe of Dutton, Braun, Staack & Hellman,

P.L.C., Waterloo, for appellee.

        Heard by Vaitheswaran, P.J., and Doyle and Bower, JJ.

**VAITHESWARAN, Presiding Judge.**

Cynthia (Cindy) and Mark Albertsen married in 2000 and divorced sixteen years later. Cindy appeals the provisions of a dissolution decree (1) granting Mark physical care of the children and (2) extending property equalization payments over eighty months.

## I. *Physical Care*

Cindy and Mark had two children, born in 2003 and 2006. Mark was an educator. He grew up in Dysart, Iowa, and became a principal there in 2005. He remained in Dysart at the time of trial.

Cindy had a degree in exercise science. After the children were born, she testified to becoming a "stay-at-home mom." In time, she took on part-time coaching positions.

In 2013, Cindy enrolled in a graduate sports management program. The program required some travel to the Illinois campus and a three-month internship, which she completed in Alabama. Mark served as primary caretaker of the children while she was in Alabama.

Cindy graduated in a year and a half. She applied for ninety-six career-related jobs around the country, including in Iowa. She was not hired within the State, and, in mid-2014, she accepted a temporary position with the Oakland Raiders in California. Later the same year, the Raiders hired her full time. Cindy expected Mark and the children to move to California at the end of the school year but later learned Mark signed a contract with the Dysart school system for the upcoming year.

Cindy petitioned for a dissolution of the marriage. The district court granted Mark temporary physical care of the children and, following trial, made that arrangement permanent.

On appeal, Cindy contends "the best interest of the children dictates that they be placed in [her] primary care." *See* Iowa Code § 598.41(3) (2015) (setting forth factors for consideration in determining what custody arrangement is in the best interest of the child); *In re Marriage of Peake*, No. 08-0131, 2009 WL 138778 at *3 (Iowa Ct. App. Jan. 22, 2009) (considering factors in primary physical care determination); *see also In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007) ("Although Iowa Code section 598.41(3) does not directly apply to *physical care* decisions, we have held that the factors listed here as well as other facts and circumstances are relevant in determining whether joint physical care is in the best interest of the child."). She asserts her decision to relocate to California was not "unilateral" and the district court failed to consider the surrounding circumstances, including her long-time role as primary caretaker. *See In re Marriage of Frederici*, 338 N.W.2d 156, 160 (Iowa 1983) (noting in a modification action, courts consider surrounding circumstances of parental relocation, including "the reason for removal, location, distance, comparative advantages and disadvantages of the new environment, impact on the children, and impact on the joint custodial and access rights of the other parent"). To the contrary, the district court made detailed fact findings on these topics.

The court found, "Up through the time Cindy began to attend [graduate school], Mark was actively involved in caring for the children, but Cindy provided the majority of the day-to-day care." The court proceeded to break down each

party's parenting time during various periods of the children's lives. When Cindy went to graduate school, the court stated, "[T]he pattern of care for the children changed so that Mark was now providing the majority of care for the children, but Cindy was still providing a significant amount of care on a regular basis." The court found, "This pattern continued for slightly less than 1 1/2 years." The court further stated:

> When Cindy moved to Alabama, the distribution of parental responsibility shifted even more. Cindy did return to visit the family on a few occasions, but from this point through the entry of temporary orders in the case, Mark was providing the vast majority of day-to-day care for the parties' children. The children were living with Mark and in Dysart, and Cindy was simply not there to provide hands-on care. She did, however, maintain as much contact and involvement as she could via phone and Skype.

The court explained that this pattern continued after entry of the temporary order.

Because both parents served as primary caretakers of the children at different times but Mark's primary caretaking role was "established for only a very few years," the district court found "the care determination in this case" to be "a relatively close one," turning on "subtle distinctions between the parties." One such distinction, the court said, had to do "with parental priorities." The court found Mark more willing to prioritize his parenting obligations over his work obligations. A second distinction had "to do with the parties' desire and capacity to support a positive relationship with the other parent." Again, the court found Mark made greater efforts to facilitate the children's relationship with their mother than Cindy did with their father. The court also considered "the parties' respective capacity to exercise good judgment." After recounting claimed incidents of poor judgment by both parents, the court expressed no "significant

concern about either party's judgment going forward." Finally, the court considered "the most important factor in assessing care . . . [,] continuity." The court noted that the younger child had lived in Dysart "for his entire life" and the older child had lived there "for almost his entire life," both had friends and family in the community, and the older child was "thriv[ing] in school and activities" while the younger child was making "steady improvement" in school and also was involved "in multiple activities." As a result, the court said, "[I]f the court awards custody to Mark, the children will maintain all the relationships they have in the Dysart community." The court considered Cindy's evidence "that the schools in [California] are top-notch" and the children would have more opportunities there than they had in Dysart. The court was not convinced the children "would be able to take advantage of these opportunities."

> The court concluded as follows:
>
> In the final analysis, the court cannot find it is in the children's best interest to move them from their life-long home in Dysart to live with Cindy in California. The children are doing very well where they are. Mark is an excellent parent. Mark has family in and near Dysart to assist with the children as needed. Cindy does not have the same support in California. A move involves significant change and stress. In the present case, there is no good reason to subject the children to that change and stress. Thus, it is in the best interest of [the children] toward primary care to Mark.

On our de novo review of the record, we agree with the bulk of the district court's findings. The court did not penalize Cindy for moving, as Cindy argues, but considered the children's deep involvement with their schools, community, extended family, and friends in Iowa. While Cindy hoped to replicate that lifestyle in California, her expectation was unrealistic for at least two reasons. First, by her own admission, the marriage was on its last legs long before her move; the

family would not be a unit as they knew it even if Mark relocated to California with the children. Second, Cindy lacked the extensive family support she had in Iowa. Although one of her sisters lived in California, Cindy presented scant, if any, evidence that this sister was involved in the children's lives. In contrast, Mark's parents and his three sisters, together with extended family, lived in or around Dysart as the children were growing up and one of the sisters and another relative continued to provide assistance as needed.

That said, we are not convinced Cindy failed to prioritize the children. Employment in her chosen career field was unavailable in Iowa at the time she completed graduate school. Given this hard reality, Cindy accepted a coveted position with an out-of-state professional team and advanced to a permanent position in a short period of time. Certainly, she could have taken employment with a local fast-food chain, as she testified. But she believed pursuit of the career in which she obtained a graduate degree would allow her "to be able to take care of" the children and provide them with "a nice way of life." Notably, Cindy made a point of communicating with the children for approximately two hours a day. She remained a significant part of their lives notwithstanding the geographic distance.

The distance, however, made a joint physical care arrangement unfeasible and required the district court to choose one of two loving parents as a physical caretaker. We conclude the district court acted in the best interest of the children by granting Mark physical care, subject to visitation with Cindy. We affirm the physical care determination.

## II.    *Property Distribution*

The district court divided the property as agreed by the parties and ordered Mark to make a $20,000 cash equalization payment to Cindy in $250 monthly increments.   Cindy contends, "[T]he $250 amount per month is inequitable in that her portion of the property division will not be fully realized for at least 80 months" and "[d]uring the 80 month payment period, Mark is enjoying the benefits of the marital property and is able to take advantage of the full amount of equity in the home."   According to Cindy, Mark has "the ability to comply with a more accelerated payment schedule of the ordered offset amount." We afford district courts considerable latitude in addressing property division issues and reverse only if there was a failure to do equity.  *In re Marriage of Smith*, 573 N.W.2d 924, 926 (Iowa 1998).

The district court provided detailed reasons for the extended payment plan, including Mark's payment of marital debts, the need to retain the parties' home for the children, and Mark's contribution of an inheritance to the marriage. Although we sympathize with Cindy's argument, we cannot conclude the district court failed to do equity, particularly where the court required Mark to pay interest on the equalization payment.  We affirm the payment plan.

## III.    *Appellate Attorney Fees*

Mark seeks an award of $5000 in appellate attorney fees and asks that costs of the appeal be taxed to Cindy.  Because he has a higher income, we decline his request.  *See In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007) (considering the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to

defend the district court's decision on appeal).  Costs on appeal are taxed equally to the parties.

**AFFIRMED.**